Our final case on the calendar for argument this morning is Brown v. Cerberus Capital Management. Good morning. May it please the Court, my name is Josh Seifert for the plaintiffs. This is a straightforward case of federal securities fraud. The defendants were plaintiff's fiduciaries who made material misrepresentations and omissions upon which plaintiffs relied to their detriment. The district court erroneously dismissed the complaint with prejudice. There are three fundamental defects with that decision, which relate to scienter, materiality, and leave to amend. Regarding scienter, as a preliminary note, the district court noted during oral argument that defendants have not really substantively challenged scienter, which they had not in their briefs or anywhere else. In any event, this court typically holds that a party can show scienter by either conscious misconduct or motive and opportunity. Both are pretty clear in this case, or abundantly clear in this case. Regarding conscious misbehavior, defendants were the controlling shareholders of all these entities in question. They conceived of these transactions. They encouraged plaintiffs to accept these transactions. And then they were in control of all the assets underlying those transactions. They drafted the contracts in question. And notably, the contracts have an acknowledgments clause, which required plaintiffs to acknowledge that they had had conversations with company representatives who had answered their questions regarding these transactions to their satisfaction. What are the allegations about Klemperer directly benefiting from the 2013 agreements? Pardon me? What are the allegations that the defendant Klemperer directly benefited from the 2013 agreements supplanting the 2012 agreements? Mr. Klemperer was an executive at Cerberus, and he sat on the board of the companies in question. I think as far as his benefit, the benefit would have been that he was inducing plaintiffs to enter into a transaction, whereby Cerberus, his principal, and he as an executive would be benefiting directly by the proffer of plaintiffs. But like any other executive, right? Excuse me? Yeah, but I think that that's – I think you're referring to like what Novak is concerned at with that kind of amorphous motive. Those cases are very – they're distinguishable because those situations typically involve an executive making an announcement, a misrepresentation to the marketplace, which then induces Party A and Party B to go into a transaction. And there the motive is difficult to discern because, you know, why would that executive care that Party A and Party B are transacting at an inflated price? This is a very different situation because this is a face-to-face transaction. This is where the company – Sorry, this is a what transaction? Face-to-face transaction where the company is saying, hey, investor, invest with us directly. Provide us with your labor, and then we will give you this investment in return or these shares in return. So the company is getting an immediate benefit by virtue of their place. That was – you're saying to induce their continued employment. I thought that was your original theory, but you seem to have abandoned that in your blue brief, and you characterize this now as insider trading, which I had a little trouble following. What is the insider trading theory? They're not – we haven't changed the theory. I mean, we use the phrase insider trading. We use that below. We've always conceived of this as insider trading because it's always been that it was a company transacting in its own shares and that involved both omissions and material misrepresentations. So that's insider trading, as this Court has discussed in the Castellano opinion. But the theory has not changed. It's always been that by inducing them into these transactions, they were not divulging material information and also misrepresenting that information. So there's no real difference, particularly in a case like this where you're transacting with a fiduciary. And that's what the Supreme Court noted in the Zanford opinion, where it said that in the context of a fiduciary relationship, there's no distinction between an omission and a misrepresentation. So we haven't changed our theory. It's always been that plaintiffs – that defendants had access to all the material information and misrepresented it. So there's no real meaningful distinction in that instance between insider trading, which is maybe more of a niche 10b-5 violation versus a material misrepresentation, which is kind of the more typical allegation of securities fraud. In both cases, you're relying on the failure to disclose, for example, for Mr. Garkin or Gokin. Gakin. Gakin. Yes. That negotiations had been undertaken. Is that right? In that specific instance, yes. And then the others are the gross up and the – But those were – as to the tax gross of the 31 percent, that was not reflected in any written agreement between them. That was a statement first made by Mr. Collins, who's not a defendant? No. It was actually made by – I believe, according to the complaint, it was first made by Mr. Klemper during the presentation and then confirmed by Mr. Collins in subsequent conversations. Correct. It's not stated specifically in the agreements. But the purpose of the presentation was to explain the agreements to the plaintiffs. And the contracts themselves, as we noted in paragraph 8 of the award agreements, specifically say that plaintiffs were required to acknowledge that they had spoken with company representatives who had explained the agreements to them. So it would make no sense to say that, you know, a plaintiff who's going into a negotiation with a fiduciary cannot rely upon – and where the contract specifically says you can rely upon this person's statements is then held to say, well, the contract didn't actually say that. That's just a misrepresentation by the fiduciary in that context, which is the basis for fraud. Am I right? There was an allegation that it was Collins who wrote it on one of the documents, hand-wrote it? Yes. So there is – so there was a presentation by Mr. Klemper where he made the representations about the gross-up, which also, as you note in the brief, is an industry standard. Then following those conversations, equity schedules were distributed to the plaintiffs, and then the plaintiffs received those. They still did not understand the proposal at this point. So each of them went to Mr. Collins, who was the CEO of the company and who had recruited them specifically, and asked him to explain what exactly was going on because they didn't feel like they were getting good answers. In four separate conversations, he explained the structure of the proposed transaction to – of the investment to them, and he made almost exactly the same representations each time. And in one of those instances, he did write down a piece on the equity schedule that was related to Mr. Sampir. Do we have that? Yes. It's attached to the complaint. That's on A-169, I think. Yeah. It's an exhibit to the complaint. So it says 35 percent. It's kind of scribbled, 35 percent tax gross-up, and then 7.5 percent, 3.5 percent, and some figures. So your claim is that this reflects a conversation that they were entitled to rely on. This reflects promises made that the defendants never intended to keep. Correct. Is that right? Yes. And since they never intended to keep them, because he was purporting to explain a corporate structure that was in place, and it turned out, as defendants admitted, that was never the case. And it was reasonable of them to rely on this as a financial promise. Why? They had nothing else to rely upon, first of all. Second of all, the contract – if this was a material part of their willingness to stay on and part of their compensation structure, these are notes. They are going into a transaction with their fiduciary, who is making specific representations. The contracts themselves, paragraph 8 specifically says that they should speak to company representatives to have them explain the contract to them. That's exactly what they did. And alternatively, there are no other contrary representations that defendants cannot point to anything else that they should have relied upon that would have actually explained their investment to them in a better manner. So they can't – there's nothing else. This was all they had. Business executives, right? Excuse me? Your clients are business executives? No. They were pharmaceutical salespeople. Salespeople. They were managers at Glaxo primarily, where they had met Mr. Collins, who had recruited them specifically to the company to manage their distribution network for this pharmaceutical – this specialty pharmaceutical company. Can I ask, with the presider's permission, assuming we don't agree with you, you would like the chance to file an amended complaint? Correct. Explain why – explain why. Well, the district court dismissed – or dismissed the complaint with prejudice without really offering – This was an amended complaint. You had already amended it, right? We had amended it once, yes, as of right. Now that it's out, we've done it as of right. There was no finding that the amendment would be futile or in bad faith. And I think if you even look at the district court's opinion, it primarily relates to Sienta or relates to Sienta as the basis for dismissal. And the points that it makes about Sienta are over and over again the court will say that Sienta seemed unclear. And so I think that, you know, obviously by amendment we could revise certain allegations to make them – or maybe break it out into – You're saying in cases like this, you were entitled to or at least ordinarily would receive the ability after you had the ability to amend as of right. Correct. The ability to amend a second time in this case specifically with respect to Sienta. Yes. I think it's – if you look at Loose v. Edelstein, that case is one of the ones that says that you typically a complaint dismissed under Rule 9b, you almost always give leave to amend. And that case cited a number of other opinions which involved amended pleadings. Did you seek leave to amend before the district court and give a proposed amended – a further amended complaint? No, we did not, Your Honor. We asked for leave at the close of our brief. And then as this goes, I think, to your point there is kind of procedurally it was kind of an odd situation where we had the oral argument. The next day the judge directed the parties to attend a settlement conference, which was twice adjourned, and then he dismissed the complaint before the settlement conference. So we didn't have an opportunity really to make a formal motion because we were – But you didn't go back to the district court and say, listen, we'd like another chance to amend, and here's our proposed complaint, and you see how it cures the deficiencies. Well, we didn't receive any deficiencies until the opinion came out. We disagree that there are deficiencies, but those deficiencies we didn't think were – because particularly, as we said, during oral argument the court noted that the defendants had not disputed Sienter. So the idea that the court would then subsequently dismiss on Sienter grounds was not something that would have been parentized. And the court did not address the possibility of filing an amendment. I don't believe it was a – My – they just – the court simply dismissed with prejudice and did not discuss the possibility or non-possibility of reasons for or reasons against. Right. There was no articulation. It just said with prejudice at the – And about amended point, no discussion. No discussion at all. And finally, just to your point, though, also the Lorelei opinion that was issued by this court, I think, in 2015, which specifically discussed amendment in these types of situations, it discussed cases where the complaint is dismissed for Sienter or materiality grounds specifically. That opinion said that often requires judicial resolution. It specifically said judicial resolution because a party often won't be able to identify the deficiencies until the court has issued an opinion saying, you know, for example, we think the allegations of Sienter are unclear. Please provide more information. Okay. I think we have the argument. Thank you very much. Ms. Sudagi. Good morning. May it please the Court. Sheila Sudagi of Lowenstein-Sandler on behalf of the appellees. Contrary to the appellant's argument on appeal, the district court did not fail to accept as true all factual allegations in the amended complaint. What the district court clearly and correctly held throughout its opinion after review of the amended complaint was that the appellant's theory of Sienter were variously unclear, but not just that they weren't cogent and were unclear, that they had no factual support, were pled in conclusory fashion, and relied on unsupported allegations of generalized motives that do not, in fact, meet the legal standard for pleading Sienter with a unique and concrete benefit that is different from the type of motive that applies to any business person who's trying to increase their investment. Did Sienter come up at the oral argument on the motion to dismiss? Sienter did come up in the oral argument on the motion to dismiss, although a lot of the focus of the oral argument was on reliance and materiality, but there was also a discussion between the district court and counsel regarding whether or not Sienter played into the reliance argument, and the district court specifically talked about the allegations of the alleged falsity of the three-and-a-half percent representation. But in this case, it was clearly argued, and the district court correctly, under Tell Labs, was required to weigh the opposing inferences and determine . . . It was clearly argued? What was Sienter? Is that what you mean? When you say it was clearly argued, was Sienter argued before the district court in the motion to dismiss? In the briefing or at the oral argument? I've got it right here. I'm just thumbing through it to see if there's any references. It's at A491, I think, right? I'm just curious, because . . . It's in the special appendix. But, yes, Sienter was addressed before . . . The reason I'm raising this is they're saying we weren't given a right to amend the complaint. We had no idea that the court was going to go off on Sienter. That's why I'm . . . Sure. So let me address the issue of the amendment of the complaint. First of all, Luce actually does talk about cases in which you've typically . . . where the sort of standard presumption that you get a right to amend or a sort of second bite at the apple once you've had the benefit of a road map for how your Sienter pleadings were deficient. Luce specifically says, and cites to cases that say that in cases where 9B claims are dismissed without leave to amend, plaintiffs have usually already had an opportunity to plead fraud with greater specificity. And that's exactly what they've had here. They filed their original complaint, and then they didn't just amend as of right and decide that they had a better idea. They waited until we filed an initial motion to dismiss that challenged the sufficiency of the allegations in the complaint, that gave them a road map as to how they were deficient, and they had the option at that point. They had the option to stand on their complaint and to oppose that motion. But they didn't know how the court was going to assess those. They didn't know whether they were going to be treated as valid objections or not. Why isn't it fair for them to get the court's ruling and then have an opportunity to amend? They absolutely could have done that. They could have opposed the motion to dismiss and said, we believe that these are sufficient, and get a court's decision about how the allegations were deficient, and use a judicial decision as a road map to replete the amended complaint. They chose not to stand on that complaint, to use the original motion to dismiss as a road map, and to purportedly cure those deficiencies in an already amended complaint. They also, as Your Honor correctly noted, in their opposition to the motion, they had one line that said, and we'd like an opportunity to plead. They made no allegations, as you see typically in these cases, which is, but Your Honor, if you disagree with us and you believe that we haven't sufficiently pled C enter, please give us leave to amend because here's a proffer of the types of things that I will be able to show if you give me another chance. I don't understand, quite frankly, the argument about the timing of the decision and not giving them an opportunity to move. They could have gone back in the motion for reconsideration and said, Your Honor, it appears that you didn't even consider, you know, did you actually consider and implicitly decide that leave to amend would be futile here because there's no discussion. They could have moved. And your motion to dismiss did raise C enter then? Yes. Yes. So they were on notice that C enter was an issue? Yes. They were on notice that C enter was an issue. And the reason why is that they were on notice that from our point of view, all of the elements of 10B were an issue because contrary to the way that they've presented this case, this is not your typical securities case. This is now a thrice pled attempt to shoehorn a contract claim and a claim for breach of contract and a claim for purported bad faith terminations of employments into a 10B statute because the contracts at issue happen to be securities. Let me ask, though. I mean, ordinarily, it seemed in my experience, you'd resolve this kind of debate about reliance and materiality and what was said and what wasn't said on summary judgment.  We have a bunch of documents here and notes evidencing maybe what was said, what wasn't said. We have unsigned contracts. The reorganization contract wasn't signed. The 2013 agreements. There's a lot of factual confusion. And we do have a closely held corporation. That is, there was a small number of shareholders. They claim that creates a fiduciary relationship. And we have a sale soon after their departure, within months after the departure, at a level, the evaluation of the company went from $400 million to over $1 billion. And so, you know, they're feeling wronged. Why is it this not enough here? Why does it fail at 12B-6 as opposed to needing to go through summary judgment? It fails for a number of reasons. And that is because from the PSLRA to 9B to how this circuit applied the requirements for pleading, see enter, and the heightened pleading standards applying to securities claims, it's a high burden. You can't do what the plaintiffs have done here, which is basically to make up allegations, assert them on information and belief, and say this fits the element of a 10B claim. Now, please let me get to discovery. There are high threshold pleading standards in this case, and particularly with respect to see enter. Given the Supreme Court's decision in Tell Labs, it's not enough to do what they're doing, which is to say here's some allegations, and it's maybe plausible that you could, and frankly, they're bootstrapped. What they're saying is you should look at what happened, exactly as Your Honor said, and look at the result, and with hindsight, go back and say, well, it must have been different. And so the only inference that you can draw is that there was some see enter and that there was an intention to defraud. One other thing that I want to be clear on, because I think it absolutely matters to all of the claims, and this is scattershot. I mean, Your Honor said you had some difficulty parsing the arguments about, you know, the basis for an insider trading claim. This is a scattershot complaint that does not do what's required, which is to plead with particularity the facts that give rise to a 10B claim as to each defendant. This is 611 paragraphs of 20 claims against 13 defendants that are all over the place. But when you boil it down, as the district court did, and actually identify what are the theories of fraud here, first of all, most of them are omission-based claims, whether you want to call them insider trading or scheme liability. They're not scheme liability. Scheme A and C claims are term of art. That's market manipulation. They all hinge on the defendants didn't tell me something. Those are omission claims. Omission claims are not actionable unless there is a duty to disclose. And counsel has stood up here and said it and said it in the appellate brief of these are shareholders. There are fiduciary duties. That is flat false. They are not shareholders. They were not shareholders. They have contractual interests in a profit participation. They have no equity rights. They have no voting rights. They are not shareholders of the company. And they've cited no case that, and I don't think that there is one, they've cited no case to support the notion that a company has a fiduciary duty to its employees with whom it also happens to have a contractual relationship related to how it's going to pay those employees. They're not fiduciaries. There's no duty to disclose. So all of the omission theories fail on that basis as well. With respect to materiality and reliance, I'll make another point on reliance. Again, it's an interesting case to try to shoehorn it into a 10B because it's not a typical security. It's a contract. The allegations of a misrepresentation claim are that you made promises to me in the contract that happens to be a security and you didn't intend to keep them. And this court is well versed in the standards for how you can, the high standard in converting what is a breach of contract case into a fraud case, which is I had no intention at the time to keep those promises. But you also have the ability to look at the award agreements in question. And that tells you two things. Number one, on the tax issue, there's these statements about representations made about the 31%. Well, how is there any reasonable reliance if the plaintiffs then sign an agreement after that that has an integration clause that says you're not relying on? You're talking to the reorg thing, the reorg agreement? The award agreement, correct, Your Honor. I didn't see any signature page in which the plaintiffs signed those. There were blank pages, except I think there was one signature by Gaken. Did I just miss that? And I believe Ms. Brown as well. I would point, Your Honor, to A-435, for example. This is the Tanya Brown award agreement. A-435 is her signature on there. I apologize, I don't have all the sites for all of this. That's on the award agreement. But I thought they were related, and the integration clause was in the restructuring agreement. I saw blank signature lines there. So on A-434, this is still part of the signed award agreement. Paragraph 10 is the entire agreement, which is this award agreement, and the operating agreement constitute the entire agreement between the parties with respect to the subject matter hereof and thereof, and supersede all prior written or oral negotiations, commitments, representations, and agreements with respect thereto. This specific agreement also has a paragraph, paragraph 12, that deals with the tax aspects. And so I think it's fair to say that if somebody made a representation about a tax gross-up, I don't know why it would be reasonable to rely on a notion that with respect to tax aspects, you're going to get a 31% gross-up. You would put that in provision 12 that talks about tax aspects and that these are going to be treated a little bit differently. And I would also add that, you know, this goes to materiality and reliance as well, which is this is all premised on this theory that the plaintiffs were tricked into signing these 2013 award agreements, and now there's a theory of sham companies and that these were illusory agreements. That's a whole separate issue. That is, in fact, a new pleading and a new theory, because the scheme theories that were pled below related to allegations of deceptive schemes to wrongfully terminate the employment and take away unvested interests. That all happens post-issuance of the 2013 awards. Now the scheme that they're arguing on appeal really is a different theory. Now the supposed scheme is a scheme to create sham companies in a transaction that was made for the purposes of duping these people into signing illusory agreements. On that point, I'll say under Tell Labs, the much more compelling inference is that these companies undertook a massive international corporate restructuring to actually benefit from a tax code and not for the purpose of duping people. If you hear hoofbeats, look for the horse, not the fraudster zebra. But also- Your time, we need to wrap up a little bit. Okay, so just make one other point on the materiality, which is that these agreements, you know, the whole premise is we were promised, we were promised, we were promised. We were going to get $5 million. You know, you did this, that, and the other thing. These agreements themselves provide for a forfeiture of these interests at any time for any reason. So there really wasn't any reasonable expectation of a guarantee of payment. They could have all been terminated the day after they signed them for any reason, for no cause, and that was within the contractual rights. They might have had a claim for breach of an implied covenant of good faith and fair dealing under the contracts or maybe a wrongful termination claim or some kind of employment claim. They're also alleging discrimination. But it's not a securities claim. Thank you very much. Okay, Mr. Seifert, two minutes rebuttal, please. Am I saying your name correctly? Is it Seifert? Yeah. Okay, just a couple of quick points regarding scienter and whether or not it was raised below. Defendants did mention, they used the phrase, I think, fraudulent intent in their opening brief, but it was raised in the context of if there was a contract, you have to show scienter. It's not a mere breach of contract does not create scienter, which is a well-established rule. They didn't go any further. The word motive, for example, is not mentioned in any of their briefs. Consciousness behavior, those concepts are not articulated at all. So they mentioned the word, but it wasn't actually substituted. But oral argument on the motion is dismissed. Was it raised at all? I believe my recollection is that Judge Daniels asked about it, but then I think it came up in the context of he said, if you're claiming that they shouldn't have relied upon these statements, if you're claiming that you never intended to rely upon these statements and they should have known that you didn't intend to rely upon these statements, he said, that sounds like a question of fact about reliance. He's like, but it also seems to be conceding that you never intended to honor the promise. So you are effectively are conceding scienter in effect. And that was kind of where it was left. He did ask me some other questions about scienter. I think kind of what you were asking about with Mr. Klemper and Mr. Collins, but it was kind of in passing. And I think our understanding was effectively that he didn't see that as a major issue. Fraud by hindsight, this is not fraud by hindsight. We're talking about specific representations that were false at the time that they were made. The fact that the company, I mean, this is a strange situation, actually. It's kind of the contrary to most fraud by hindsight situations, where the investment itself, the assets at issue were actually worth far more than anyone had expected. Mr. Collins, for example, predicted that the assets would be worth somewhere between $350 and $700 million. In fact, they were worth $1.2 billion or more. The fraud was plaintiff's share of that, which was specifically promised to them at one point, which was just false. About the minority shareholders point, they were, in fact, minority shareholders. If you look at their award agreements, they were always given interests in two entities, both times. An entity that related to management specifically, as well as separate interests in a larger entity. And in those, which was Covis U.S. Holdings and also Covis U.S. And in both of those entities, they owned, I think, 1.25 of Covis Holdings and 6.11% of Covis U.S. Holdings. And in both instances, Cerberus or a Cerberus affiliate owned the vast majority of shares in those companies. And those were the companies that actually owned the assets, or purportedly owned the assets in question. Thank you very much. I think we have your argument. Thank you. We'll take the matter under advisement. That concludes our oral arguments for this morning. We have two cases on submission, Horton v. Wells Fargo Bank and Neal v. Town of East Haven. And we'll reserve a decision on each of those. The clerk will please adjourn court. Court is adjourned.